IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| Macsteel International USA Corp. | § | Civil Action No. |
| | § | |
| v. | § | |
| | § | |
| QSL - Texas Terminals, LLC and | § | |
| Empire Stevedoring (Houston) Inc. | § | ADMIRALTY - FRCP 9(h) |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Macsteel International USA Corp. and, for its Complaint against Defendants QSL - Texas Terminals, LLC and Empire Stevedoring (Houston) Inc., alleges as follows:

### I. PARTIES

1.1     Plaintiff Macsteel International USA Corp. ("Macsteel") was and is a corporation duly formed, organized and existing under and by virtue of the laws of the state of Delaware with a principal place of business in the state of New York.

    1.1.1   Macsteel is in the business of, among other things, trading steel wire rod coils ("WRC") internationally. Macsteel purchases WRC from foreign suppliers and then sells them to its customers in the United States of America. The WRC are carried by ocean going vessels from foreign ports to ports in the United States, where the WRC are unloaded and then either picked up by Macsteel's customer or transshipped for delivery to Macsteel's customer.

1.2     Defendant QSL - Texas Terminals, LLC ("QSL - Texas Terminals") was and is a limited liability company duly formed, organized and existing under and by

1

virtue of the laws of the state of Texas with a principal place of business in Pasadena, Southern District of Texas, doing business in the state of Texas for the purpose of accumulating monetary profit.  This Defendant may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

       1.2.1   The members of QSL - Texas Terminals are either citizens of a foreign state, the state of Illinois, or a state other than the state of Delaware or the state of New York.

       1.2.2   QSL - Texas Terminals provides stevedore services and/or is a marine terminal operator in the Southern District of Texas.  It provides wharfage, dock or other terminal facilities in connection with common carriers or in connection with a common carrier and a water carrier.

   1.3   Defendant Empire Stevedoring (Houston) Inc. ("Empire") was and is a corporation duly formed, organized and existing under and by virtue of the laws of the state of Texas with a principal place of business in Pasadena, Southern District of Texas.  This Defendant may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

       1.3.1   Empire provides stevedore services and/or is a marine terminal operator in the Southern District of Texas.  It provides wharfage, dock or other terminal facilities in connection with common carriers or in connection with a common carrier and a water carrier.

1.4 QSL - Texas Terminals and Empire (collectively "QSL") are part of the QSL group of companies.

1.4.1 QSL describes itself as "a world-class maritime terminal operator and stevedore that develops tailor-made solutions to offer innovative handling methods while paying careful attention to the cargo and the specific needs of the customer."

## II. JURISDICTION AND VENUE

2.1 The following issues concern breach of a maritime contract and thereby present an admiralty or maritime claim within the jurisdiction of the United States and this Honorable Court pursuant to Article III, section 2 of the U.S. Constitution, 28 U.S.C. § 1333, and Federal Rule of Civil Procedure 9(h).

2.1.1 In the alternative, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

2.2 Venue is proper in this admiralty action as the Defendants are subject to personal jurisdiction in this District.

2.2.1 In the alternative, venue is proper in this District because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## III. FACTS GIVING RISE TO LIABILITY

A.  M/V *Nicholas*

3.1   In or about March 2022, Macsteel purchased several thousand WRC from a foreign supplier that were carried by sea from India to Houston, Texas on the M/V *Nicholas*.

3.2   Macsteel, in turn, sold the WRC to customers in the United States. The terms of sale required the customers to pick up the WRC at Houston.

3.3   Macsteel was obligated to pay for the costs of unloading the WRC from the *Nicholas*.

3.4   Macsteel contracted QSL on or about May 4, 2022, to provide a berth for the unloading of the *Nicholas* and to act as stevedore.

3.5   It is not clear which QSL company Macsteel contracted with. Macsteel received an invoice on "QSL America" letterhead that directed payment be made to "QSL Texas Terminal" but that referenced "unloading wire rod coil at the Empire Houston Dock." The invoice was for both stevedoring and wharfage.

3.6   All obligations under the contract to be performed on the part of Macsteel were performed, waived or otherwise excused.

3.7   As stevedore, QSL was contracted to unload the WRC from the *Nicholas* to the terminal facility and then reload the WRC to trucks.

3.8   In acting as stevedore, QSL warranted that the services would be performed in a diligent and workmanlike manner.

3.9   The *Nicholas* docked at the QSL terminal facility on May 12, 2022.

3.10  QSL had handled a prior shipment of WRC for Macsteel in about February 2022 in connection with the discharge of the M/V *Chios Sunrise*.

3.11  Having handled a prior shipment of WRC for Macsteel, QSL knew Macsteel's requirements and knew that the WRC needed to be kept free of debris to prevent damage to the WRC.

3.12  Discharge of the WRC from the *Nicholas* started on May 12, 2022, and ended on May 18, 2022.

3.13  Incidental to the unloading of the WRC from the *Nicholas* and reloading them to trucks for pick up by Macsteel's customers, QSL agreed to store the WRC at its terminal facility until the WRC were picked up.

3.14  Among other obligations and duties, QSL had an obligation and duty to return the WRC in the same order and condition as when entrusted to QSL.

3.15  The WRC discharged from the *Nicholas* were stored at the QSL terminal facility and/or on the dock and/or at an adjacent yard belonging to QSL until they were loaded onto trucks.

3.16  Macsteel has learned that, prior to the arrival of the *Nicholas* at the QSL terminal, a vessel loaded with cement had been discharged at the same terminal, which resulted in the dock being fouled with cement powder.

3.17  Based on its prior experience discharging WRC for Macsteel from the M/V *Chios Sunrise*, and because QSL knew that the dock was fouled with cement powder, it knowingly or recklessly discharged the WRC to the spoiled dock anyway, despite knowing and/or recklessly disregarding that the WRC needed to be kept free of debris to

prevent damage to or fouling of the WRC, but willfully disregarded its own knowledge when it failed to take precautions to protect the WRC, or even to discuss with Macsteel additional precautions which Macsteel could undertake, at its own expense, to protect the WRC.

3.18    Macsteel's customers ultimately rejected about 112 WRC because of corrosive rust and/or contamination by foreign substances, which rendered the WRC unusable for the customers' intended purposes.

3.19    Large quantities of cement powder were found inside the external wrapping of the WRC.

3.20    Attempts were made to remove the corrosive rust from the affected WRC, but such efforts were not successful.

3.21    As a result of its customers' rejection of the WRC, Macsteel was required to issue refunds to the customers for the rejected WRC and to incur certain expenses and/or expenses were incurred on its behalf.

3.22    The rejected WRC were sold for salvage value.

3.23    As a result of QSL's breach of contract, willful misconduct and/or gross negligence and/or, alternatively, negligence, Macsteel suffered net damages in the amount of $311,863.88 because of the corrosive rust and/or the contamination by foreign substances on the WRC after discharge from the *Nicholas* at Houston, plus expenses.

3.24    Investigation and analysis of the affected WRC, including lab testing, indicates that the corrosive rust and/or the contamination by foreign substances was caused by cement after discharge at Houston and while being handled by QSL.

B. **M/V *Propel Passion***

3.25   In or about March 2022, Macsteel purchased several thousand WRC from a foreign supplier that were carried by sea from India to Houston, Texas on the M/V *Propel Passion*.

3.26   Macsteel, in turn, sold the WRC to customers in the United States. The terms of sale required the customers to pick up the WRC at Houston.

3.27   The *Propel Passion* arrived at the Port of Houston anchorage on or about May 16, 2022.

3.28   Macsteel was obligated to pay for the costs of unloading the WRC from the *Propel Passion*.

3.29   Macsteel contracted QSL on or about May 18, 2022, to provide a berth for the unloading of the *Propel Passion* and to act as stevedore.

3.30   It is not clear which QSL company Macsteel contracted with. Macsteel received a quote that was on "QSL America" letterhead signed by "QSL Texas Terminal" but that stated the WRC would be handled at "Empire Terminal in Houston." Likewise, Macsteel received an invoice on "QSL America" letterhead that directed payment be made to "QSL Texas Terminal" but that referenced "unloading wire rod coils at the Empire Houston Dock." The invoice was for both stevedoring and wharfage.

3.31   All obligations under the contract to be performed on the part of Macsteel were performed, waived or otherwise excused.

3.32   As stevedore, QSL was contracted to unload the WRC from the *Propel Passion* to the terminal facility and then reload the WRC to trucks.

3.33    In acting as stevedore, QSL warranted that the services would be performed in a diligent and workmanlike manner.

3.34    QSL had handled a prior shipment of WRC for Macsteel in about February 2022 in connection with the discharge of the *Chios Sunrise*.

3.35    Having handled a prior shipment of WRC for Macsteel, QSL knew Macsteel's requirements and knew that the WRC needed to be kept free of debris to prevent damage to the WRC.

3.36    QSL wrote in an email to Macsteel on May 19, 2022, to advise that it had "the space [for the WRC] however the ground is not slab but dirt." QSL went on to state that it "[knew] this was an issue previously" and "wanted to let [Macsteel] know." QSL then offered to "purchase plywood and get this laid on ground so that WRC could rest on top."

3.37    Macsteel replied to QSL's email minutes later, stating: "Trader advised he is concerned with some of the gravel getting stuck in the coils for the customers cleaning process. Based on that discussion please proceed with ordering plywood for the yard."

3.38    In a separate email exchange on May 19, 2022, between Macsteel and QSL Macsteel instructed: "Further to separate email, confirm Macsteel acceptance of plywood for the yard where material will be kept. Please ensure plywood is in place before cargo is laid in the gravel."

3.39    After having been told by QSL that delivery of plywood may be delayed, Macsteel advised QSL later in the same email exchange on May 19, 2022: "In the case that plywood is not immediately available we can also accept thick tarps being placed under the coils while we wait."

3.40    The invoice issued to Macsteel by "QSL America" for stevedoring and wharfage in connection with the unloading of the *Propel Passion* included a charge for twenty bundles of plywood described as: "Plywood supplied for dunnage in dirt area."

3.41    The *Propel Passion* docked at the QSL terminal facility on May 20, 2022. Discharge of the WRC from the *Propel Passion* started on May 20, 2022.

3.42    Macsteel sent an email to QSL on May 24, 2022 to object to WRC being placed onto bare ground contrary to Macsteel's express instructions and to emphasize the need for the WRC to be put on plywood:

> Understand there are a large number of slinkied coils coming off MV PROPEL PASSION. Also understand that in order to maintain discharge speed coils are being placed on the ground in the FTZ yard, photos attached for reference.. As per my previous emails we **absolutely need plywood under each and every coil that goes into the FTZ Yard**. We have already agreed to purchase a minimum of 20 bundles of plywood at significant cost to us to ensure the safe storage of this cargo.
>
> \* \* \*
>
> … I cannot stress enough how important it is that this cargo, round or slinkied, not be placed on anything other than the paved dock space or the plywood we have purchased for the FTZ yard.

(emphasis in original).

3.43    Macsteel suggested a course of action in its May 24, 2022, email to address the situation, including offering to pay for overtime labor.

9

3.44    QSL responded to Macsteel in an email on May 25, 2022, and admitted that "[t]here were a limited number of slinkies that were improperly placed without the dunnage." QSL stated that "[it] will have this remedied immediately."

3.45    Macsteel replied to QSL on May 25, 2022, and again offered: "… if there is anything you think is necessary, OT, Additional truck, etc, to which Macsteel can contribute so that remainder of discharge goes smoothly and cargo is stored properly please let us know, we remain at your disposal to help in any way possible."

3.46    Discharge of the WRC from the *Propel Passion* ended on May 26, 2022.

3.47    Incidental to the unloading of the WRC from the *Propel Passion* and reloading them to trucks for pick up by Macsteel's customers, QSL agreed to store the WRC at its terminal facility until the WRC were picked up.

3.48    The rates quoted by QSL included, among other things, thirty days of outside storage.

3.49    Among other obligations and duties, QSL had an obligation and duty to return the WRC in the same order and condition as when entrusted to QSL.

3.50    The WRC discharged from the *Propel Passion* were stored at the QSL terminal facility and/or on the dock and/or at an adjacent yard belonging to QSL until they were loaded onto trucks.

3.51    Macsteel sent an email to QSL on May 27, 2022 to report that "some coils are being covered by bulk concrete blowing off the pile in the yard" and to request that QSL "[p]lease either tarp the pile of concrete or move our steel away from it today." Macsteel again emphasized the importance of keeping the WRC free of debris:

Again our customers processing of this material cannot be done if there are any debris stuck in the coils, this is why we bought the plywood for the FTZ yard, to keep rocks and pebbles from getting stuck in them. Now we see that loose concrete is being blown on top of them raising similar concerns but this time from above the coils not below them.

3.52   QSL responded to Macsteel in an email on May 27, 2022, and

acknowledged the blowing cement:

The referenced Cement is in [supersacks] with bladders and stored outside. While there are some bags that have been compromised (ripped/torn) the degradation is minimal and contained. Strong winds can carry some dust through the terminal in same fashion as dirt debris. We will continue to move the balance of this to the FTZ yard and I can forward pics of same.

3.53   Macsteel replied to QSL in an email later on May 27, 2002, and disputed

QSL minimizing the exposure to loose cement:

…there appears to be in attached photo a substantial pile of concrete adjacent to our coils. Please prioritize moving these coils to the FTZ ASAP today if the pile will not be tarped. While currently only a few coils may be affected by the blowing concrete, the longer they sit there the more likely it will be that additional coils are affected and potentially damaged.



3.54   Macsteel has learned that, prior to the arrival of the *Propel Passion* at the QSL terminal, a vessel loaded with cement had been discharged at the same terminal, which resulted in the dock being fouled with cement powder.

3.55   Based on its prior experience discharging WRC for Macsteel from the M/V *Chios Sunrise,* QSL knew that the WRC could not be placed onto dirt and agreed to take measures, at Macsteel's cost, so that the WRC would not be placed onto dirt.  Despite this knowledge and agreement, QSL knowingly or recklessly placed the WRC onto bare ground anyway, despite knowing and/or recklessly disregarding that the WRC needed to be kept free of debris to prevent damage to or fouling of the WRC.

3.56   QSL also knew that the dock was fouled with cement powder but knowingly or recklessly discharged the WRC to the spoiled dock anyway, despite knowing and/or recklessly disregarding that the WRC needed to be kept free of debris to prevent damage to or fouling of the WRC, as shown in this photo:



3.57    Macsteel's customers ultimately rejected about 511 WRC because of corrosive rust and/or contamination by foreign substances, which rendered the WRC unusable for the customers' intended purposes.

3.58    Large quantities of cement powder were found inside the external wrapping of WRC.

3.59    Attempts were made to remove the corrosive rust from the affected WRC, but such efforts were not successful.

3.60    As a result of its customers' rejection of the WRC, Macsteel was required to issue refunds to the customers for the rejected WRC and to incur certain expenses and/or expenses were incurred on its behalf.

3.61    The rejected WRC were ultimately sold for scrap value.

3.62    As a result of QSL's breach of contract, willful misconduct and/or gross negligence and/or, alternatively, negligence, Macsteel suffered net damages in the amount of $1,223,428.87 because of the corrosive rust and/or the contamination by foreign substances on the WRC after discharge from the *Propel Passion* at Houston, plus expenses.

3.63    Investigation and analysis of the affected WRC, including lab testing, indicates that the corrosive rust and/or the contamination by foreign substances was caused by cement after discharge at Houston and while being handled by QSL.

## IV. CAUSES OF ACTION

### A.  FIRST CAUSE OF ACTION: BREACH OF CONTRACT FOR UNLOADING THE *NICHOLAS* AND IN HANDLING WRC

4.1    Macsteel repeats and realleges each and every allegation set forth in paragraphs 3.1 through 3.63 of this Complaint with the same force and effect as if more fully set forth herein.

4.2    QSL breached the contract with Macsteel in connection with the unloading of the *Nicholas* and the handling of the WRC discharged from the vessel.

4.3    Macsteel suffered damages because of the breach of contract by QSL.

4.4    The damages suffered by Macsteel were the result of willful misconduct and/or gross negligence of QSL.

4.5    In the alternative, the damages suffered by Macsteel were the result of QSL's negligence and failing to perform the services in a diligent and workmanlike manner.

4.6    Macsteel is entitled to recover the damages suffered because of the breach of contract by QSL.

### B.  SECOND CAUSE OF ACTION: BREACH OF CONTRACT FOR UNLOADING THE *PROPEL PASSION* AND IN HANDLING WRC

4.7    Macsteel repeats and realleges each and every allegation set forth in paragraphs 3.1 through 3.63 of this Complaint with the same force and effect as if more fully set forth herein.

4.8    QSL breached the contract with Macsteel in connection with the unloading of the *Propel Passion* and the handling of the WRC discharged from the vessel.

4.9     Macsteel suffered damages because of the breach of contract by QSL.

4.10    The damages suffered by Macsteel were the result of willful misconduct and/or gross negligence of QSL.

4.11    In the alternative, the damages suffered by Macsteel were the result of QSL's negligence and failing to perform the services in a diligent and workmanlike manner.

4.12    Macsteel is entitled to recover the damages suffered because of the breach of contract by QSL.

### C.     THIRD CAUSE OF ACTION: IMPROPER HANDLING OF WRC DISCHARGED FROM THE *NICHOLAS*

4.13    Macsteel repeats and realleges each and every allegation set forth in paragraphs 3.1 through 3.63 of this Complaint with the same force and effect as if more fully set forth herein.

4.14    The WRC discharged from the *Nicholas* were entrusted to the care, custody and control of QSL.

4.15    The WRC discharged from the *Nicholas* were in the care, custody and control of QSL at the time said WRC were damaged.

4.16    QSL failed to return the WRC discharged from the *Nicholas* in same order and condition as when the WRC were entrusted to QSL.

4.17    The damage to the WRC discharged from the *Nicholas* was caused by or resulted from the acts or omissions of QSL.

4.18    Macsteel suffered damages because of the acts or omissions of QSL.

15

4.19    Macsteel is entitled to recover the damages suffered because of the willful misconduct and/or gross negligence and/or, alternatively, negligence of QSL.

### D.    FOURTH CAUSE OF ACTION: IMPROPER HANDLING OF WRC DISCHARGED FROM THE *PROPEL PASSION*

4.20    Macsteel repeats and realleges each and every allegation set forth in paragraphs 3.1 through 3.63 of this Complaint with the same force and effect as if more fully set forth herein.

4.21    The WRC discharged from the *Propel Passion* were entrusted to the care, custody and control of QSL.

4.22    The WRC discharged from the *Propel Passion* were in the care, custody and control of QSL at the time said WRC were damaged.

4.23    QSL failed to return the WRC discharged from the *Propel Passion* in same order and condition as when the WRC were entrusted to QSL.

4.24    The damage to the WRC discharged from the *Propel Passion* was caused by or resulted from the acts or omissions of QSL.

4.25    Macsteel suffered damages because of the acts or omissions of QSL.

4.26    Macsteel is entitled to recover the damages suffered because of the willful misconduct and/or gross negligence and/or, alternatively, negligence of QSL.

## V. DAMAGES

5.1    As a result of QSL's breaches of contract with Macsteel, gross negligence, willful misconduct, and other breaches of duty owed to Macsteel, Macsteel has suffered a loss of approximately $311,863.88 because of the corrosive rust and/or the contamination

16

by foreign substances on the WRC after discharge from the *Nicholas* at Houston, plus expenses, and $1,223,428.87 because of the corrosive rust and/or the contamination by foreign substances on the WRC after discharge from the *Propel Passion* at Houston, plus expenses, exclusive of interest, costs and other expenses incurred, for which Macsteel brings this action.

5.2     In addition to the aforementioned damages, Macsteel hereby demands statutory attorneys' fees as allowed by section 38.001 of the Texas Civil Practice and Remedies Code, Texas state law, and applicable maritime law.

WHEREFORE, Plaintiff Macsteel International USA Corp. prays for judgment against Defendants QSL - Texas Terminals, LLC, and Empire Stevedoring (Houston) Inc., awarding Plaintiff damages in an amount to be determined at trial, together with reasonable and necessary attorneys' fees, plus interest at the legal rate until paid, and all costs of Court.  Plaintiff prays for all such further relief, both general and special, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

*/s/ David S. Toy*
David S. Toy
SBN 24048029 / SDTX ID 588699
DAVID TOY LAW FIRM
4309 Yoakum Boulevard, Suite 2050
Houston, TX 77002
david.toy@davidtoylaw.com
(T) 713 322 7911

OF COUNSEL:

Terry L. Stoltz (*pro hac vice* to be filed)
tstoltz@nicolettihornig.com
Kevin J.B. O'Malley (*pro hac vice* to be filed)
komalley@nicolettihornig.com
NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005
(T) 212 220 3830

***Attorneys for Plaintiff,
Macsteel International USA Corp.***